UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

— — — — — — — — — — — — — — — — — — — x

JOHNSON & JOHNSON and LIFESCAN, INC.,

                      Plaintiffs,

    -against-

ADELPHIA DISCOUNT SERVICES, INC.,
ADELPHIA SUPPLY USA, INC.,
ADELPHIA DIABETIC SUPPLY, INC.,
U.S. DIABETIC SUPPLY and
YUDAH NEUMAN a/k/a LENNY NEUMAN,

                      Defendants.

— — — — — — — — — — — — — — — — — — — x

**COMPLAINT**

Civil Action No.

JURY TRIAL DEMANDED

**FILED**
IN CLERK'S OFFICE
U.S. DISTRICT COURT E.D.N.Y.

★ APR 10 2014 ★

LONG ISLAND OFFICE

CV - 14 2311

ROSS, J.

    Plaintiffs Johnson & Johnson ("J&J") and LifeScan, Inc. ("LifeScan") (collectively "Plaintiffs"), for their complaint against Adelphia Discount Services, Inc., Adelphia Supply USA, Inc., Adelphia Diabetic Supply, Inc., U.S. Diabetic Supply and Yudah Neuman a/k/a Lenny Neuman (collectively "Defendants"), allege as follows:

J. ORENSTEIN, M.J.

## NATURE OF THE ACTION

    1.    This is a Complaint for damages and injunctive relief for Defendants' acts of trademark infringement, unfair competition, fraud and breach of a settlement agreement under federal and state law. Plaintiffs are the source of the well-known and world-renowned ONETOUCH blood glucose test strips, which are used with ONETOUCH blood glucose meters by diabetics to monitor their blood glucose levels. Plaintiffs' claims arise from Defendants' unauthorized importation, distribution and sale of gray market ONETOUCH test strips ("Gray Market ONETOUCH Test Strips") which are materially different from ONETOUCH test strips designed and authorized to be sold in the United States ("U.S. ONETOUCH Test Strips"). More specifically, Defendants opportunistically import, distribute and sell within the United States

certain ONETOUCH test strips that are intended to be sold in various countries of the world other than the United States and that are materially different than the ONETOUCH products intended and authorized for sale in the United States.

    2.    The material differences between the Gray Market ONETOUCH Test Strips and the legitimate U.S. ONETOUCH Test Strips are numerous and readily apparent from a cursory review of the products. These differences include, without limitation:

- A legend included on the side of the Gray Market ONETOUCH Test Strips box that the product is "Not for sale in the U.S." This legend does not appear on U.S. ONETOUCH Test Strips.

- The Gray Market ONETOUCH Test Strips include a black ONETOUCH branded band across the center of the strip; on the U.S. ONETOUCH Test Strips this band is blue and branded with ONETOUCH ULTRA.

- The Gray Market ONETOUCH Test Strips are packaged in a box and in vials that use different coloring and trade dress than the U.S. ONETOUCH Test Strips.

- The handling and use instructions for the Gray Market ONETOUCH Test Strips use metric measurements, rather than the United States measurements used for U.S. ONETOUCH Test Strips.

- Temperatures on the product packaging for the Gray Market ONETOUCH Test Strips are displayed in degrees Centigrade, whereas degrees Fahrenheit are used on U.S. ONETOUCH Test Strips packaging.

- The customer care telephone numbers printed on the box for the Gray Market ONETOUCH Test Strips are foreign numbers that are not generally accessible from the United States, while United States toll free numbers are used for United States consumers and purchasers of U.S. ONETOUCH Test Strips.

- The Gray Market ONETOUCH Test Strips packaging and instructions contain various European symbols that are unfamiliar to United States consumers. These symbols are not used with the U.S. ONETOUCH Test Strips.

- The packaging and instructions for the Gray Market ONETOUCH Test Strips use British spellings as opposed to United States English spellings for certain words, for example "hypoglycaemia," "hyperglycaemia," and "haematocrit."

- Plaintiffs do not allow returns of Gray Market ONETOUCH Test Strips in the United States.

- Gray Market ONETOUCH Test Strips are not eligible for marketing or promotional advantages offered by Plaintiffs in the United States.

3.      Many of these material differences raise significant health and safety concerns for diabetic users of the ONETOUCH products.  For example, the lack of a United States customer care line for United States purchasers of Gray Market ONETOUCH Test Strips makes it difficult for purchasers with questions or problems to contact Plaintiffs for assistance.  Likewise, the use of metric measurements, Celsius temperatures, and European symbols and spelling with Gray Market ONETOUCH Test Strips may potentially cause misuse or mishandling by United States purchasers of the gray market products.

4.      In addition, Plaintiffs take great care to ensure that U.S. ONETOUCH Test Strips are shipped to wholesalers and distributors under certain conditions designed to maintain the safety and integrity of the products.  With Gray Market ONETOUCH Test Strips, like the ones sold by Defendants, Plaintiffs have no assurance that such products are shipped and handled under optimum conditions.

5.      Defendants' unauthorized gray market importation and subsequent distribution causes, or is likely to cause, consumer confusion, mistake and deception to the detriment of Plaintiffs, as well as to the detriment of the consumers and purchasers of the Gray Market ONETOUCH Test Strips in the United States.  Purchasers and consumers in the United States have come to expect a certain quality, packaging, appearance and overall image for the U.S. ONETOUCH Test Strips as a result of Plaintiffs' extensive branding, marketing, sales, and quality control efforts in the United States.  When such purchasers and consumers encounter the Gray Market ONETOUCH Test Strips, which bear certain of Plaintiffs' trademarks but which are materially different from what United States purchasers and consumers expect, they are likely to be confused and, indeed, disappointed.  In addition, because Plaintiffs' products are

crucial to the health and well-being of the diabetic consumers who rely on the ONETOUCH Test Strips for blood glucose readings, the material differences between Gray Market ONETOUCH Test Strips and U.S. ONETOUCH Test Strips pose a significant health and safety risk to the unknowing and unsuspecting purchasers of Gray Market ONETOUCH Test Strips.  Further, such sales of Gray Market ONETOUCH Test Strips cause great damage to Plaintiffs and greatly damage the goodwill of Plaintiffs' valuable trademarks.

6.       In June 2012, Plaintiffs notified the defendants Yudah Neuman a/k/a Lenny Neuman, Adelphia Supply USA, Inc. and Adelphia Discount Services, Inc. that their sale and distribution of Gray Market ONETOUCH Test Strips was in violation of federal and state law.

7.       The defendants entered into negotiations with the Plaintiffs to resolve the issues caused by their unlawful sale of gray market test strips.  These negotiations culminated in the execution of a *Confidential Agreement and Undertaking Regarding Certain Imported Glucose Test Strips* on March 13, 2013 (the "Agreement").  A copy of the Agreement is attached hereto as Exhibit A.  In the Agreement, the defendants agreed that they "will not distribute, market, sell or offer for sale in the United States" the gray market test strips.

8.       The defendants have deliberately and intentionally violated the Agreement by selling Gray Market ONETOUCH Test Strips to the public.

9.       Based on this unlawful conduct by Defendants, as set forth further below, Plaintiffs bring claims of federal trademark infringement under Section 32 of the Lanham Act, 15 U.S.C. §1114(1), federal unfair competition and false designation of origin under Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), trademark infringement under the laws of the State of New York, and breach of contract and fraud under the laws of the State of New York.

4

Plaintiffs seek injunctive relief, multiple damages, recovery of their attorneys' fees and costs and other relief authorized by federal and state law.

## JURISDICTION AND VENUE

10.    This Court has jurisdiction under Section 39 of the Trademark Act of 1946 (the "Lanham Act"), 15 U.S.C. § 1121, under Sections 1331, 1338(a), 1338(b) and 1367 of the Judicial Code, 28 U.S.C. §§ 1331, 1338(a), 1338(b) and 1367 and under principles of pendent jurisdiction. This Court also has jurisdiction pursuant to 28 U.S.C. § 1332 as there is diversity of citizenship between the parties and the matter in controversy exceeds, exclusive of interest and costs, the sum of seventy-five thousand dollars.

11.    This Court has personal jurisdiction over the Defendants because the Defendants are residents of New York and the unlawful acts complained of herein took place in New York.

12.    Venue is proper in this judicial district under 28 U.S.C. § 1391(b) and (c).

## PARTIES

13.    Plaintiff Johnson & Johnson is a New Jersey corporation having a principal place of business at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933.

14.    Plaintiff LifeScan, Inc. is a California corporation having a principal place of business at 1000 Gibraltar Drive, Milpitas, California 95035.

15.    Defendant Adelphia Discount Services, Inc. is, upon information and belief, a corporation organized under the laws of the State of New York with a usual place of business at 4111 Ft. Hamilton Parkway, Brooklyn, New York 11219.

16.    Defendant Adelphia Supply USA, Inc. is, upon information and belief, a corporation organized under the laws of the State of New York with a usual place of business at 4111 Ft. Hamilton Parkway, Brooklyn, New York 11219.

17.     Defendant Adelphia Diabetic Supply, Inc. is, upon information and belief, a corporation organized under the laws of the State of New York with a usual place of business at 4111 Ft. Hamilton Parkway, Brooklyn, New York 11219.

18.     Defendant U.S. Diabetic Supply is, upon information and belief, a fictitious name used by the defendant Yudah Neuman a/k/a Lenny Neuman to disguise his unlawful activities.  It operates from 4111 Ft. Hamilton Parkway, Brooklyn, New York 11219

19.     Defendant Yudah Neuman a/k/a Lenny Neuman owns and operates Adelphia Discount Services, Inc., Adelphia Supply USA, Adelphia Diabetic Supply, Inc. and U.S. Diabetic Supply, resides at 1428 36th Street, Brooklyn, New York 11218, and has a usual place of business at 4111 Ft. Hamilton Parkway, Brooklyn, New York 11219.

## FACTS

20.     J&J is an international pharmaceutical, medical devices and consumer packaged goods manufacturer founded in 1886.  Due to its extensive experience over the years, J&J is viewed as a dependable source of high-quality and reliable products.

21.     LifeScan, an operating subsidiary of J&J, is the distributor of the world-renowned, high quality ONETOUCH blood glucose test strips used with ONETOUCH blood glucose meters by diabetics to monitor their blood glucose levels.

22.     Diabetes is a group of diseases characterized by high blood glucose levels that result from defects in the body's ability to produce and/or use insulin.  According the American Diabetes Association, diabetes affects more than 25 million Americans.  Diabetes is a chronic disease that must be managed closely to avoid the risk of serious illness or death.

23.    For over twenty years, LifeScan has revolutionized the ease and convenience with which diabetics can manage and maintain their blood glucose levels, including through use of LifeScan's ONETOUCH blood glucose test strips.

24.    J&J is the owner of incontestable registered federal trademarks appearing on packaging for ONETOUCH test strips, including: LIFESCAN, Reg. No. 1384863, ONETOUCH, Reg. No. 2863393, ONE TOUCH, Reg. Nos. 1484999 and 2710143, and ONE TOUCH ULTRA, Reg. No. 2538658 (collectively, the "ONETOUCH Marks").

25.    Plaintiffs have spent and continue to spend tens of millions of dollars marketing and promoting in interstate and international commerce their ONETOUCH blood glucose test strips in high-quality boxes bearing the ONETOUCH trademarks and trade dress.

26.    In the United States alone, Plaintiffs' sales of test strips in the last five years have totaled billions of dollars.

27.    LifeScan's ONETOUCH test strips have also enjoyed considerable success worldwide.

28.    As a result of the extensive advertising of ONETOUCH test strips and the celebrity that ONETOUCH Marks have achieved, blood glucose test strips bearing ONETOUCH Marks have been and are now recognized by the public and in trade as a distinctive source identifier and as a symbol of high quality and safety.

29.    As is the case with many products, particularly those related to health and safety, there are significant and material differences between the ONETOUCH products sold abroad and those sold in the United States.  Unfortunately, Plaintiffs have experienced a growing problem with opportunistic sellers, like Defendants, offering for sale in the United States ONETOUCH products that are intended for use abroad, including ONETOUCH Test Strips.

30.    This is not the first time that Defendants have been caught misusing Plaintiffs' trademarks and products.  In 2011, the United States Food and Drug Administration (FDA) refused admission into the United States of certain foreign ONETOUCH test strips that were imported by the Defendants or their affiliates.

31.    In 2012, Plaintiffs confronted Defendants with evidence that Defendants were engaged in the unlawful sale of Gray Market ONETOUCH Test Strips.  The Defendants entered into negotiations with the Plaintiffs to resolve the issues raised by their unlawful sale and distribution of Gray Market ONETOUCH test strips.

32.    The negotiations between the parties culminated in the execution of a settlement agreement entitled *Confidential Agreement and Undertaking Regarding Certain Imported Glucose Test Strips* dated March 13, 2012 ("the Agreement").  Under the Agreement, the defendants agreed that they "will not distribute, market, sell or offer for sale in the United States" the gray market test strips.

33.    Defendants import, distribute, and/or sell materially different Gray Market ONETOUCH Test Strips intended for sale in foreign countries, and such actions are undertaken by Defendants in the United States and in this District.

34.    The Gray Market ONETOUCH Test Strips sold by Defendants bear the ONETOUCH Marks.  See Exhibit B for photographs of the Gray Market ONETOUCH Test Strips purchased from Defendants.

35.    In addition, the Gray Market ONETOUCH Test Strips sold by Defendants include a product insert that is intended for use only with ONETOUCH Test Strips sold abroad.  See Exhibit C for a copy of the product insert included with Gray Market ONETOUCH Test Strips purchased from Defendants.

8

36.    Furthermore, the Gray Market ONETOUCH Test Strips sold by Defendants are visually different from U.S. ONETOUCH Test Strips in that the Gray Market ONETOUCH Test Strips are black, whereas legitimate U.S. ONETOUCH Test Strips are blue and the Gray Market ONETOUCH Test Strips use trade dress and product packaging colors that differ significantly from the U.S. ONETOUCH Test Strips.  *See* Exhibit B for photographs of Gray Market ONETOUCH Test Strips purchased from Defendants and Exhibit D for photographs of U.S. ONETOUCH Test Strips.

37.    The distinguishing characteristics of the Gray Market ONETOUCH Test Strips and material differences from the U.S. ONETOUCH Test Strips include, without limitation, the following:

- A legend, shown below, included on the side of the Gray Market ONETOUCH Test Strips box clearly indicates that the product is "Not for sale in the U.S."  The Defendants have caused this legend to be covered on the boxes that they sell to the public.



**Gray Market Box**

- A black "ONETOUCH" branded band across the center of the strip on the Gray Market ONETOUCH Test Strips. See Exhibit B. On U.S. ONETOUCH Test Strips this band is blue and includes the "ONETOUCH ULTRA" brand. A side-by-side comparison of Gray Market ONETOUCH Test Strips sold by Defendants with U.S. ONETOUCH Test Strips is shown below (see also Exhibits B and D):

| Gray Market ONETOUCH Test Strips | U.S. ONETOUCH Test Strips |
|---|---|
|  | |

- The Gray Market ONETOUCH Test Strips are packaged in a box and in vials that use different coloring and trade dress than the U.S. ONETOUCH Test Strips. A side-by-side comparison of Gray Market ONETOUCH Test Strip boxes and vials sold by Defendants and a U.S. ONETOUCH Test Strip box and vial is shown below (see also Exhibits B and D):

| Defendant's Gray Market ONETOUCH Test Strips | U.S. ONETOUCH Test Strips |
|---|---|
|  | |
| | |

10

| Defendants' Grey Market ONETOUCH TestStrips | U.S. ONETOUCH Test Strips |
|---|---|
|  |  |

- The handling and use instructions for the Gray Market ONETOUCH Test Strips primarily use metric measurements. See Exhibit C.

- Temperatures on the product packaging for the Gray Market ONETOUCH Test Strips are expressed in degrees Centigrade. See Exhibit B.

- The customer care telephone numbers printed on the box for the Gray Market ONETOUCH Test Strips are foreign telephone numbers using exchanges located outside of the United States. See Exhibits B and C. For the U.S. ONETOUCH Test Strips, the product packaging and inserts include a United States toll free telephone number. See Exhibits D and E.

- The Gray Market ONETOUCH Test Strips packaging and instructions contain various European symbols that are unfamiliar to United States consumers. See Exhibits B and C.

- The packaging and instructions for the Gray Market ONETOUCH Test Strips use British spellings as opposed to United States English spellings for certain words, for example "hypoglycaemia," "hyperglycaemia," and "haematocrit." See Exhibit C.

- Plaintiffs do not allow returns of Gray Market ONETOUCH Test Strips in the United States.

- Gray Market ONETOUCH Test Strips are not eligible for marketing or promotional advantages offered by Plaintiffs in the United States.

11

38.    Furthermore, the Defendants' shipping standards, temperature controls and removal of expired product are outside of Plaintiffs' control.  Therefore, a consumer may encounter expired or mishandled Gray Market ONETOUCH Test Strips and wrongfully attribute the sale of such product to Plaintiffs.

39.    Overall, these material differences can create an impression among United States consumers of a strange, low quality, or different product from the product they expect to encounter in the United States, and are thus directly at odds with Plaintiffs' reputation for providing reliable, high-quality and safe ONETOUCH products.  Accordingly, as consumers are likely to associate Defendants' Gray Market ONETOUCH Test Strips with Plaintiffs and with the authorized U.S. ONETOUCH Test Strips, such material differences are likely to create a negative impression of the U.S. ONETOUCH Test Strips among United States consumers and tarnish or otherwise harm Plaintiffs' reputation and goodwill.

40.    The distribution and sale by Defendants of such materially different Gray Market ONETOUCH Test Strips is likely to undermine Plaintiffs' reputation for producing high-quality products, as purchasers or consumers are likely to be confused by the presence of the ONETOUCH Marks on such products, and may therefore associate any deficiencies in the Gray Market ONETOUCH Test Strips with Plaintiffs and the U.S. ONETOUCH Test Strips.

41.    Upon information and belief, Defendants were well aware of the fame and strong goodwill associated with the ONETOUCH Marks and Plaintiffs' exclusive rights in the ONETOUCH Marks when they began to import, distribute, and/or sell Gray Market ONETOUCH Test Strips in the United States, and, therefore, Defendants intended to trade on the strong reputation, goodwill, and fame of the ONETOUCH Marks.

42.     Due to Defendants' wrongful acts as set forth above, Plaintiffs have suffered and will continue to suffer substantial and irreparable injury, loss and damage to their rights in and to the ONETOUCH Marks.

43.     In addition, the consuming public will continue to be harmed by the confusion caused by Defendants' distribution and/or sale of the Gray Market ONETOUCH Test Strips and by the potential health and safety risks caused by Defendants' actions.

**COUNT I**
**Federal Trademark Infringement**
**15 U.S.C. §1114(1)**

44.     Plaintiffs incorporate each paragraph of this Complaint as if fully set forth herein.

45.     Plaintiff J&J is the owner of all right, title and interest in and to the ONETOUCH Marks (as set forth above) and Plaintiff LifeScan is a licensee of the ONETOUCH Marks.

46.     Defendants, without authorization, have imported into the United States and distributed and sold in the United States, Gray Market ONETOUCH Test Strips featuring the ONETOUCH Marks, which products are materially different from the U.S. ONETOUCH Test Strips authorized by Plaintiffs for sale in the United States, and such actions are likely to cause confusion, or to cause mistake or to deceive.

47.     Defendants' acts have been committed deliberately and willfully, with knowledge of Plaintiffs' exclusive rights and goodwill in the ONETOUCH Marks, and of the infringing nature of the mark when used in connection with the Gray Market ONETOUCH Test Strips, as well as with bad faith and the intent to cause confusion, or to cause mistake and/or to deceive.

48.     As a result of Defendants' trademark infringement, Plaintiffs have suffered and will continue to suffer substantial and irreparable injury, loss, and damage to their rights in and to the ONETOUCH Marks, as well as the goodwill associated therewith, for which they have no adequate remedy at law.

49.    If not restrained, Defendants will have unfairly derived and will continue to derive income, profits, and business opportunities as a result of their acts of infringement.

50.    As the acts alleged herein constitute infringement of the ONETOUCH Marks under 15 U.S.C. § 1114(1), and as Plaintiffs have no adequate remedy at law, Plaintiffs are entitled to injunctive relief as well as to Defendants' profits and other remedies provided by 15 U.S.C. §§ 1116, 1117 and 1118, and to reasonable attorneys' fees and prejudgment interest pursuant to 15 U.S.C. § 1117(b).

## COUNT II
### Federal Unfair Competition
### 15 U.S.C. § 1125(a)(i)(A)

51.    Plaintiffs incorporate each paragraph of this Complaint as if fully set forth herein.

52.    Defendants have, without authorization, imported into the United States and/or distributed and/or sold in the United States, Gray Market ONETOUCH Test Strips featuring the ONETOUCH Marks, which products are materially different from the U.S. ONETOUCH Test Strips authorized by Plaintiffs for sale in the United States and such use is likely to cause confusion, or to cause mistake and/or to deceive as to the affiliation, connection or association of Defendants with Plaintiffs, and as to the origin, sponsorship or approval by Plaintiffs of Defendants' Gray Market ONETOUCH Test Strips and the commercial activities related to Defendants' Gray Market ONETOUCH Test Strips.

53.    Defendants' acts have been committed with knowledge of Plaintiffs' exclusive common law rights and goodwill in the ONETOUCH Marks, as well as with bad faith and the intent to cause confusion or mistake, and/or to deceive.

54.    Plaintiffs have suffered and, if Defendants are not enjoined, will continue to suffer great and irreparable injury, loss, and damage to their rights in and to the ONETOUCH Marks and the goodwill associated therewith for which Plaintiffs have no adequate remedy at law.

55.     If not restrained, Defendants will have unfairly derived and will continue to derive income, profits, and business opportunities as a result of their acts of infringement.

56.     As the acts alleged herein violate Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), and as Plaintiffs have no adequate remedy at law, Plaintiffs are entitled to injunctive relief and to Defendants' profits and other remedies provided by 15 U.S.C. §§ 1116, 1117 and 1118, and to reasonable attorneys' fees and prejudgment interest pursuant to 15 U.S.C. § 1117(b).

## COUNT III
### Common Law Trademark Infringement

57.     Plaintiffs incorporate each paragraph of this Complaint as if fully set forth herein.

58.     Defendants' conduct as described above constitutes trademark infringement and passing off in violation of the common law of the State of New York.

59.     Defendants' conduct, as described above, has caused and will cause irreparable injury to Plaintiffs and, unless said acts are restrained by this Court, such conduct will be continued and Plaintiffs will continue to suffer irreparable injury.

60.     Plaintiffs have no adequate remedy at law.

61.     Defendants' conduct described above has harmed Plaintiffs' reputation and has caused damaged to Plaintiffs in an amount to be determined.

62.     Defendants' conduct described above has unlawfully enriched and benefited Defendants in an amount to be determined.

## COUNT IV
### Breach of Contract

63.     Plaintiffs incorporate each paragraph of this Complaint as if fully set forth herein.

64.     On or about March 13, 2013, the defendants Yudah Neuman a/k/a Lenny Neuman, Adelphia Discount Services, Inc. and Adelphia Supply USA, Inc. entered into a settlement agreement with Plaintiffs.  The Agreement is called the *Confidential Agreement And Undertaking Regarding Certain Imported Glucose Test Strips*.

65.     Pursuant to Paragraph 6 of the Agreement, Yudah Neuman a/k/a Lenny Neuman and Adelphia Discount Services, Inc. and Adelphia Supply USA, Inc. covenanted, promised and agreed that they "will not distribute, market, sell or offer for sale in the United States" the gray market test strips.

66.     Pursuant to Paragraph 8 of the Agreement, Yudah Neuman a/k/a Lenny Neuman and Adelphia Discount Services, Inc. and Adelphia Supply USA, Inc. agreed that in the event that they breach Paragraph 6 of the Agreement (i) Plaintiffs will be entitled to seek equitable relief, including injunctive relief and specific performance without having to post a bond; and (ii) they would pay Johnson & Johnson $25 for each breach with each infringing item sold in the United States considered a separate breach.

67.     Shortly after execution of the Agreement, the defendants again commenced selling and distributing gray market test strips, in direct violation of the Agreement.

68.     The defendants' actions described above are direct violations of the Agreement. The defendants' actions constitute breach of contract which has greatly damaged the Plaintiffs.

## COUNT V
### Fraud

69.     Plaintiffs incorporate each paragraph of this Complaint as if fully set forth herein.

70.     During their negotiations in 2012 and 2013, Defendants represented to Plaintiffs that they would stop selling Gray Market ONETOUCH Test Strips if Plaintiffs would release them from liability and would enter into the Agreement.

16

71.    At the time Defendants made the representations described above, Defendants had no intention of stopping the sale of Gray Market ONETOUCH Test Strips. This is evident from the Defendants' sale of Gray Market ONETOUCH Test Strips several months after the Agreement was executed. Upon information and belief, Defendants were planning to sell Gray Market ONETOUCH Test Strips at the same time they were signing the Agreement not to engage in such conduct.

72.    The representations made above were material, and the Plaintiffs relied on the Defendants' good faith and honesty in entering into the Agreement.

73.    In truth, the representations and promises made by Defendants in the Agreement were false. Defendants had no intention of keeping the promises and covenants they made in the Agreement. If Plaintiffs had known that Defendants had no intention of performing their promises, Plaintiffs would not have entered into the Agreement.

74.    As a result of the Defendants' fraudulent acts and omissions, as set forth above, the Plaintiffs have been greatly damaged.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray:

1.    That the Court enter judgment that Defendants' actions have violated and, unless enjoined, will continue to violate the Plaintiffs' rights under Section 32 and Section 43(a) of the Lanham Act.

2.    That the Court enter judgment that Defendants have competed unfairly with Plaintiffs as set forth in this Complaint, in violation of Plaintiffs' rights under the Lanham Act.

3.      That the Court preliminarily and permanently enjoin and restrain Defendants and their owners, directors, officers, agents, servants, employees, subsidiaries, affiliates, and all persons acting in concert or participating with Defendants from:

    a.      distributing, using, selling or offering for sale in the United States Gray Market ONETOUCH Test Strips;

    b.      otherwise competing unfairly with Plaintiffs in any manner;

    c.      conspiring with, aiding, assisting or abetting any other person or business entity from engaging in or performing any of the activities referred to in subparagraphs (a) and (b), above.

4.      That the Court order Defendants and their owners, directors, officers, agents, servants, employees and all persons acting in concert or participating with Defendants to deliver up for destruction all Gray Market ONETOUCH Test Strips or otherwise infringing articles and materials in their possession or control.

5.      That the Court order Defendants to file with the Court and to serve on counsel for Plaintiffs, within thirty (30) days after the entry and service on Defendants of an injunction, a report in writing and under oath setting for the in detail the manner and form in which Defendants have complied with the foregoing injunction provisions.

6.      That the Court order an accounting and render judgment against Defendants for an amount equal to treble all profits received from their unlawful acts.

7.      That the Court enter judgment in favor of Plaintiffs for all damages sustained on account of Defendants' trademark infringement and that such damages be trebled pursuant to Section 35 of the Lanham Act, 15 U.S.C. § 1117(a).

8.      That the Court enter judgment in favor of Plaintiffs for all damages sustained on account of Defendants' breach of contract and fraud.

9. That Plaintiffs be awarded their attorneys' fees and costs incurred in this action pursuant to 15 U.S.C. § 1117(a) and pursuant to the Agreement between the parties.

10. For such other and further relief as the Court deems just and equitable.

Dated:   April 9, 2014

JOHNSON & JOHNSON and
LIFESCAN, INC.,

By their attorneys,

John A. DeMaro
RUSKIN MOSCOU FALTISCHEK, P.C.
1425 RXR Plaza
Uniondale, NY  11556
(516) 663-6505
jdemaro@rmfpc.com

*Attorneys for Johnson & Johnson and
LifeScan, Inc.*

## CONFIDENTIAL AGREEMENT AND UNDERTAKING REGARDING CERTAIN IMPORTED GLUCOSE TEST STRIPS

1.    Johnson & Johnson of New Brunswick, New Jersey is the owner of the JOHNSON & JOHNSON, LIFESCAN, ONETOUCH , ONE TOUCH, ONETOUCH ULTRA and ONE TOUCH ULTRA trademarks, and LifeScan, Inc., of Milpitas, California, (a subsidiary of Johnson & Johnson) has manufactured, marketed and sold branded glucose test strips under such trademarks in the United States and outside the United States.

2.    Johnson & Johnson and LifeScan, Inc. have contacted the Companies, Adelphia Discount Services, Inc. and Adelphia Supply USA, Inc., 4111 Fort Hamilton Parkway, Brooklyn, NY 11219 (collectively "the Companies"), and their President, Lenny Neuman, and have asserted that LifeScan, Inc. manufactures certain identified packages of its above named ONE TOUCH/ONETOUCH etc. branded test strips in packaging and labeling which type of packaging and labeling is (a) asserted by Johnson & Johnson and LifeScan, Inc. to be intended by them and their affiliate/subsidiaries exclusively for sale and use outside the United States and also is (b) asserted by Johnson & Johnson LifeScan to be in packaging and labeling which is materially different from the corresponding above named branded marketed test strips packages as currently marketed and sold by LifeScan, Inc in the United States. The above branded test strips in such identified type of packaging and labeling are hereafter referred to as the "identified materially different test strips."

3.    The Companies, among others, have previously sold in the United States , imported ONE TOUCH ULTRA/ONETOUCH ULTRA brand glucose test strips manufactured by LifeScan, Inc. described above as the "identified materially different test strips." The

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

LN March 13 2013

estimated total amount of sales in the United States by the Companies of the " identified

materially different test strips" during the past 5 years is

$ *3,500,000* _____ , and the products were purchased by the

Companies from various suppliers including but not limited to at least the following named

suppliers:

*GlobalMed Ltd. Unit 7 Parkend, Harlow Business Park, Harlow Essex  CM19 5QF UK*

*Casharim Trading, 3 Hagavish P O Box 2179, Kfar Saba  44102  ISRAEL*

---

4.      Johnson & Johnson and LifeScan, Inc. have further asserted that such sale by the

Companies in the United States of the " identified materially different test strips" infringes

Johnson & Johnson's LIFESCAN, JOHNSON & JOHNSON, ONE TOUCH ULTRA,

ONETOUCH ULTRA, and ONE TOUCH and ONETOUCH trademarks. Johnson & Johnson and

LifeScan, Inc. have also asserted that Johnson & Johnson could demand from the Companies and

Lenny Neuman, the payment of substantial damages for trademark infringement and that Johnson

& Johnson could seek a Judgment enjoining the Companies and Lenny Neuman from the claimed

future infringement of the above-identified Johnson & Johnson trademarks. The Companies and

Lenny Neuman do not agree that they have previously violated any of Johnson & Johnson's or

LifeScan, Inc.'s rights but desire to avoid litigation and make this agreement and undertaking for

the purpose of settlement without admission of any wrongdoing.

5.      As part of such a settlement, Johnson & Johnson and LifeScan, Inc. have agreed

to execute a release of their damage claims against the Companies, their officers, employees, all

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

*L N   March  13  2003*

3

of their suppliers (including but not limited to any named above) and direct and indirect customers, as more fully described in the copy of Release attached and made a part hereof, if the Companies and Lenny Neuman, their President, will execute this Agreement and Undertaking.

6. In consideration of Johnson & Johnson's and LifeScan, Inc.'s settlement of their claims and the terms of this Agreement and Undertaking, the Companies and Lenny Neuman hereby undertake, covenant, promise and agree that they will not distribute, market, sell or offer for sale in the United States the above "identified materially different test strips."

7. The Companies and Lenny Neuman represent and warrant that they do not have any inventory of the identified materially different test strips which are the subject of this agreement.

8. It is understood and agreed that Johnson & Johnson and LifeScan, Inc. will be irreparably injured by any breach by the Companies or Lenny Neuman of the covenant in Paragraph 6 of this Agreement and Undertaking; that money damages will not be an adequate remedy for any such breach; and that Johnson & Johnson and LifeScan, Inc. will be entitled to seek equitable relief, including injunctive relief and specific performance, without having to post a bond, as their remedy for any such breach. The Companies and Lenny Neuman further agree that in the event that any of them breaches the covenant of paragraph 6 of this Agreement and Undertaking, the breaching party will also pay to Johnson & Johnson the sum of Twenty-Five Dollars ($25.00) for each such breach. Each infringing item sold in the United States shall be considered a separate breach under this paragraph.

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

LN    MARCH 13 2013

4

9.      The parties to this Agreement are aware that third parties have in the past imported and sold and are continuing to sell the materially different test strips in the United States. Johnson & Johnson and LifeScan, Inc. have represented that they are determined to prevent such activity. Johnson & Johnson and LifeScan, Inc. represent and warrant that, in the past, they and their affiliates/subsidiaries that have not entered into an agreement, settlement or other authorization which knowingly allowed or allows the importing, marketing or distribution of materially different ONETOUCH/ONE TOUCH etc. brand test strips in the United States and that there has not been any judicial or administrative ruling allowing any such activity. If there has been any such knowing allowance or if , at any time in the future, either Johnson & Johnson or LifeScan, Inc. or their affiliates/subsidiaries shall make such an agreement, settlement or other knowing authorization or if there has been or will be a judicial or administrative ruling or change of law which allows the importing, marketing or distribution of materially different test strips in the United States, Johnson & Johnson and LifeScan, Inc. will promptly inform the Companies and Lenny Neuman and further agree that this Agreement and Undertaking will be amended to permit the Companies and Lenny Neuman to sell or distribute such test strips in the United States on the same terms and conditions.

10.      As a matter of definition, the parties agree that the terms ONETOUCH (single word) and ONE TOUCH (two words) and any hybrids thereof shall deemed interchangeable and the same for the purpose of all rights and obligations under this agreement.

11.      All the parties hereto represent that they have not and will not disclose the contents or existence of this Agreement and Undertaking to any third parties (not including the

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

LN MARCH 13 2013

5

officers, employees or legal and financial advisors of the parties ) without the prior written

consent of the other parties, except to the extent necessary to enforce or implement the rights

granted hereunder. The Companies and Lenny Neumann shall not be required to give testimony

or produce documents in any proceeding without their consent.

     12.    In the event of any action relating to this Agreement and Undertaking, the

prevailing party in any such action will be entitled to recover all of its reasonable legal

expenses associated with such action, including attorneys' fees, from the other party. E-Mail

copies of this fully executed agreement shall in all respects be deemed equivalent of originals.

Dated:  ~~February~~ *March* *13*, 2013

                    Lenny Neumann, Individually and as President
                    of Adelphia Discount Services, Inc. and
                    Adelphia Supply USA, Inc.

AGREED TO AND ACCEPTED

Johnson & Johnson
By _____
     Daniel Chung, Chief Trademark Counsel

LifeScan Inc.
By _____
     Marc Benson, Assistant General Counsel

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

                    L N   March  13  2013

6

State of New York
Kings, County ss.

On this 13th day of ~~February~~ *March* , 2013, before me, the undersigned Notary Public, personally appeared Lenny Neuman, proved to me through satisfactory evidence of identification to be the person whose name is signed above, and he acknowledged to me that he signed it voluntarily as his free act and deed.

Notary Public

Print Name:    JOSEPH PFEIFER
               Notary Public, State of New York
               No. 01PF6191527
               Qualified in Kings County
My Commission Expires: Commission Expires August 25, 2016

On this 5th day of ~~February~~ *March* , 2013, before me, the undersigned Notary Public, personally appeared Daniel Chung, proved to me through satisfactory evidence of identification to be the person whose name is signed above, and he acknowledged to me that he signed it voluntarily as his free act and deed.

Notary Public

Print Name:    LEA A. DINANNO
               NOTARY PUBLIC OF NEW JERSEY
               My Commission Expires 3/9/2015

My Commission Expires:

On this _____ day of February , 2013, before me, the undersigned Notary Public, personally appeared Marc Benson, proved to me through satisfactory evidence of identification to be the person whose name is signed above, and he acknowledged to me that he signed it voluntarily as his free act and deed.

Attached
loose
Certificate

Notary Public

Print Name:

My Commission Expires:

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

MARCH  13  2013

6 A

## ACKNOWLEDGMENT

State of California
County of Santa Clara                    )

On March 11, 2013             before me, Michela Rhynard Notary Public
                                              (insert name and title of the officer)

personally appeared Marc Benson                                      ,
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

MICHELA RHYNARD
Commission # 1868016
Notary Public - California
Santa Clara County
My Comm. Expires Nov 8, 2013

Signature Michela Rhynard            (Seal)

L N  MARCH  13  2013

7

## RELEASE

WHEREAS, the undersigned Johnson & Johnson is the owner of the JOHNSON & JOHNSON, LIFESCAN, ONETOUCH , ONE TOUCH, ONETOUCH ULTRA and ONE TOUCH ULTRA trademarks, and the undersigned LifeScan, Inc. (a subsidiary of Johnson & Johnson) has manufactured, marketed and sold branded glucose test strips under such trademarks (collectively "Releasors"); and

WHEREAS, Adelphia Discount Services, Inc. and Adelphia Supply USA, Inc. and Lenny Neuman (collectively "Releasees") have executed , at the request of Releasors, the attached Agreement and Undertaking.

NOW, THEREFORE, in consideration of the Releasees' executing the Agreement and Undertaking, the Releasors do hereby fully, finally and forever release hold harmless and discharge Releasees and their parent(s), predecessors, affiliates and successors, and all of their respective subsidiaries and affiliates, and each of their respective officers, directors, shareholders, employees, agents, representatives, attorneys, heirs, successors and assigns, and all of their suppliers and direct and indirect customers, from all actions, causes of action, suits, claims, damages, losses, expenses, judgments, liabilities, covenants, contracts, agreements and demands or claims whatsoever, whether in law or in equity, whether by contract, statute or tort, whether known or unknown, whether suspected or not suspected, which the Releasors or their predecessors, successors and assigns ever had, or now have, against all or any of the released parties, entities and persons from the beginning of time to the date of this Release, including but not limited to such claims as may arise from the purchasing, importing, marketing and sale prior to the date hereof of the products which are the subject of the Agreement and Undertaking. As regards suppliers named in the Agreement and Undertaking, the aforementioned release shall apply to all such activities even if not involving Releasees. As regards Suppliers not named in the Agreement and Undertaking the aforementioned release shall apply to such activities relating to transactions involving Releasees. This Release shall not apply to any obligation that arise solely from actions by a released party entity or person occurring after the date of this Release.

Signed to be effective as of the 5th day of March, 2013.

Johnson & Johnson

By _____

Daniel Chung, Chief Trademark Counsel

LifeScan, Inc.

By _____

Marc Benson, Assistant General Counsel

CONFIDENTIAL AGREEMENT EXECUTION COPY FEBRUARY 20, 2013

IN MARCH 13 2013

8

On this 5th day of ~~February~~ March 20, 2013, before me, the undersigned Notary Public, personally appeared DANIEL CHUNG, proved to me through satisfactory evidence of identification to be the person whose name is signed above, and he acknowledged to me that he signed it voluntarily as his free act and deed.

Notary Public _Lea A. DiNanno_

Print Name: LEA A. DINANNO
NOTARY PUBLIC OF NEW JERSEY
My Commission Expires 3/30/2013

My Commission Expires:

On this _____ day of February , 2013, before me, the undersigned Notary Public, personally appeared MARC BENSON , proved to me through satisfactory evidence of identification to be the person whose name is signed above, and he acknowledged to me that he signed it voluntarily as his free act and deed.

Attached loose
Certificate

Notary Public

Print Name:

My Commission Expires:

on MARCH 13 2013

*8 A*

---

### ACKNOWLEDGMENT

State of California
County of _Santa Clara_                    )

On _March 11, 2013_ before me, _Michela Rhynard  Notary Public_
(insert name and title of the officer)

personally appeared _Marc Benson_
who proved to me on the basis of satisfactory evidence to be the person(s) whose name(s) is/are
subscribed to the within instrument and acknowledged to me that he/she/they executed the same in
his/her/their authorized capacity(ies), and that by his/her/their signature(s) on the instrument the
person(s), or the entity upon behalf of which the person(s) acted, executed the instrument.

I certify under PENALTY OF PERJURY under the laws of the State of California that the foregoing
paragraph is true and correct.

WITNESS my hand and official seal.

MICHELA RHYNARD
Commission # 1868016
Notary Public - California
Santa Clara County
My Comm. Expires Nov 8, 2013

Signature _Michela Rhynard_          (Seal)

---

*LN   MARCH 13 2013*













For self-testing. Do Not refrigerate. Do Not use if the expiration date has passed. Use within 6 months of opening test strip vial.

Para autodiagnóstico. No refrigerar. No utilizar después de la fecha de caducidad. Desechar a los 6 meses de haber abierto el frasco.

Para auto-monitorização. Não guarde no frigorífico. Não utilize após a data de validade. Utilize no prazo de 6 meses após a abertura do tubo de tiras de teste.

Rev. Date: 04/2011    020-298







 **For self-testing.**

**IMPORTANT:** Please read this information and your OneTouch® Ultra® Family of Meters, and InDuo™ Systems Owner's Booklet before using OneTouch® Ultra® Test Strips. Do Not use your OneTouch® Ultra® Brand Test Strips if your vial is open or damaged in any way as this could lead to error messages or inaccurate blood glucose values. Call Customer Care in the UK at 0800 121200 (UK), 1800 535676 (Ireland) immediately if the test strip vial is open or damaged, or if these instructional materials or your meter results seem unclear.

## Intended Use

OneTouch® Ultra® Test Strips are used with the OneTouch® Ultra® Family of Meters, and In Duo™ Systems for quantitatively measuring glucose in fresh capillary whole blood. The OneTouch® Ultra® Test Strips and associated meters are intended for use by people with diabetes at home and healthcare professionals in the clinical setting. OneTouch® Ultra® Test Strips and associated meters are for use in fingertip, palm and forearm testing.

## Storage and Handling

- Store the test strip vial in a cool dry place below 30°C (86°F). **Do Not** refrigerate. Keep away from direct sunlight and heat. Exposure to temperatures and/or humidity outside the required storage conditions may result in inaccurate readings.
- Store your test strips in their original vial only. To avoid damage or contamination, **Do Not** transfer test strips to any other container.
- **Do Not** open the test strip vial until you are ready to test. **Only open vial when removing strips.**
- After removing a test strip from the vial, immediately close the vial lid tightly. Use each test strip immediately after removing it from the vial.
- **Do Not** use test strips from any vial that is damaged or left open to air.
- Write the discard date (date opened plus 6 months) on the vial label when you first open it.
- **Do Not** use test strips beyond the expiration (printed on vial label) or discard date, whichever comes first.
- Avoid getting dirt, food, or liquids on the test strip. With clean, dry hands, you may touch the test strip anywhere on its surface.
- **Do Not** bend, cut, or alter the test strip in any way.
- Test strips are for single use only. Never reuse a test strip that had blood or control solution applied to it.
- Make sure your meter and test strips are about the same temperature before you test.
- Apply only control solution or a blood sample to the test strip.
- After performing a test, **Do Not** return the used test strip to the vial.
- Used test strips may be considered biohazardous waste in your area. Be sure to follow your healthcare professional's recommendations or your local regulations for proper disposal.
- ⚠ **WARNING:** Keep the test strip vial away from children; test strips are a choking hazard. **Do Not** swallow test strips. The test strip vial may contain drying agents that are harmful if inhaled or swallowed and may cause skin or eye irritation. **Do Not** ingest or swallow any items.

## Blood Glucose Test Procedure

For instructions on performing a blood test (including blood sample collection), refer to the Owner's Booklet that came with your system.

⚠ **CAUTION:** Matching the code on the meter and the code on the test strip vial is essential to obtain accurate results. Each time you test, check to make sure the code numbers match. For instructions on coding the meter, refer to the Owner's Booklet that came with your system.

## Test Results

**Low Glucose Values**
If your test result is below 1.1 mmol/L (20 mg/dL), a warning message will appear indicating a low glucose level. This may indicate severe hypoglycaemia (low blood glucose). **Treat this condition immediately, according to your healthcare professional's recommendations.** Although this message could be due to a test error, it is safer to treat first, and then do another test.

**High Glucose Values**
If your test result is above 33.3 mmol/L (600 mg/dL), a warning message will appear indicating a high glucose level. This may indicate severe hyperglycaemia (high blood glucose). You should retest your glucose level. If the message appears again, call your healthcare professional immediately.

---

This study shows that the OneTouch® Ultra® Meter compares well with a laboratory method. Additional clinical studies were performed using meters from the OneTouch® Ultra® Family of Meters, and the InDuo™ System.[3]

**Precision:**

| Within Run Precision | Blood$_{av}$ 2.5 mmol/L (45 mg/dL) | CV = 3.2% |
|---|---|---|
| | Blood$_{av}$ 4.3 mmol/L (77 mg/dL) | CV = 2.0% |
| | Blood$_{av}$ 7.2 mmol/L (129 mg/dL) | CV = 2.1% |
| | Blood$_{av}$ 12.2 mmol/L (220 mg/dL) | CV = 1.8% |
| | Blood$_{av}$ 20.2 mmol/L (364 mg/dL) | CV = 1.6% |
| Total Precision | Control 2.4 mmol/L (44 mg/dL) | CV = 4.4% |
| | Control 9.5 mmol/L (171 mg/dL) | CV = 2.6% |
| | Control 20.3 mmol/L (366 mg/dL) | CV = 2.4% |

This study shows a variability from test strip to test strip in blood tests of 3.2% or less.

**IMPORTANT:** For complete operating instructions and other important technical information, refer to the Owner's Booklet that came with your system. IF YOU HAVE QUESTIONS ABOUT THE USE OF ANY LIFESCAN PRODUCT, PLEASE CONTACT Customer Care in the UK 0800 121200 (UK), 1800 535676 (Ireland).

## References

1. Beaser, R.S. and Hill, Joan: The Joslin Guide to Diabetes. New York: Simon and Schuster (1995), p. 158.
2. Data on file.
3. Data on file.
4. American Diabetes Association, Position Statement, Diagnosis and Classification of Diabetes Mellitus, Diabetes Care 31:S55-S60, 2008.

**OUR COMMITMENT TO YOU:**
Our goal is to provide you with quality health care products and dedicated customer service. If you are not fully satisfied with this product, contact your authorised LifeScan representative at 0800 121200 (UK), 1800 535676 (Ireland).
If you cannot reach Customer Care (in the UK), contact your healthcare professional for advice.

**Para autodiagnóstico.**

**IMPORTANTE:** antes de utilizar las tiras reactivas OneTouch® Ultra®, lea esta información y el manual de usuario de su medidor OneTouch® Ultra® y los medidores correspondientes de la marca OneTouch® Ultra® si el vial está abierto o ha sufrido algún tipo de daño, ya que podría provocar la aparición de mensajes de error o valores incorrectos de glucosa en sangre. Si detecta que el vial de tiras reactivas está abierto o dañado, o si este material explicativo o los resultados indicados por su medidor no le parecen claros, póngase en contacto inmediatamente con nuestra Línea de Atención Personal en el 900 100 228.

## Indicaciones

Las tiras reactivas OneTouch® Ultra® se usan con los medidores de glucosa en sangre de la marca OneTouch® Ultra® para medir de forma cuantitativa los niveles de glucosa en la sangre capilar recién extraída. Las tiras reactivas OneTouch® Ultra® y los medidores correspondientes están diseñados para uso doméstico por parte de personas diabéticas y para aplicaciones profesionales en centros médicos. Las tiras reactivas OneTouch® Ultra® y los medidores correspondientes están diseñados para efectuar análisis en la yema de los dedos, en la palma de la mano y en el antebrazo.

## Almacenamiento y manejo

- Guarde el vial de tiras reactivas en un lugar fresco y seco a una temperatura inferior a 30°C (86°F). No refrigerar. Mantener lejos de fuentes de calor y de la luz solar directa. La exposición a niveles de temperatura o de humedad fuera de las condiciones de almacenamiento previstas puede dar lugar a resultados incorrectos.
- Guarde las tiras reactivas únicamente en el vial original. Para evitar que se estropeen o se contaminen, NO guarde las tiras reactivas en ningún otro envase.
- No abra el vial de tiras reactivas antes de haber finalizado todos los preparativos para el análisis. Abra el vial sólo para extraer tiras reactivas.
- Después de extraer una tira reactiva del vial, vuelva a colocar la tapa y ciérrela firmemente. Utilice la tira reactiva inmediatamente después de haberla sacado del vial.
- No utilice las tiras reactivas de ningún vial dañado o cuyo contenido haya estado expuesto al aire.

**If You Get Unexpected Results**

If your blood glucose result is below 3.9 mmol/L (70 mg/dL), indicating low blood glucose, or above 10.0 mmol/L (180 mg/dL), indicating high blood glucose, you should contact and follow your healthcare professional's treatment advice.[1] If you continue to get unexpected results, check your system with control solution. If you are experiencing symptoms that are not consistent with your blood glucose test results AND you have followed all instructions described in your Owner's Booklet, call your healthcare professional. Never ignore symptoms or make significant changes to your diabetes control program without speaking to your healthcare professional.

## Range of Expected Values

Blood glucose management requires the help of a health care professional. Together you can set your own range of expected blood glucose values, arrange your testing times, and discuss the meaning of your blood glucose results.

Expected blood glucose levels for people without diabetes:

| Time | Range, mmol/L | Range, mg/dL |
|---|---|---|
| Fasting | Less than 5.6 | Less than 100 |
| 2 hours after meals | Less than 7.8 | Less than 140 |

## Checking the System

**Use OneTouch® Ultra® Control Solutions**
A control solution test is performed to check that the meter and test strips are working together properly and that you are performing the test correctly. For instructions on how and when to check the system by performing a control solution test, refer to the Owner's Booklet that came with your system.

## Limitations of Procedure

OneTouch® Ultra® Test Strips give accurate results when the following limitations are observed:
- **Do Not** use for the diagnosis of diabetes or for testing of newborns.
- Test strips are for single use only. **Do Not** reuse.
- The test strips are specific to D-glucose and do not react to other sugars, which may be present in blood.
- Use only fresh capillary whole blood. **Do Not** use serum or plasma.
- Haematocrit is the percentage of red blood cells in the blood. Extremes in haematocrit may affect test results.[1] Haematocrit levels below 30% may cause falsely high readings and haematocrit levels over 55% may cause falsely low readings. If you do not know your haematocrit level, consult your healthcare professional.
- OneTouch® Ultra® Test Strips may be used at altitudes up to 3,048 meters (10,000 feet) without an effect on test results. Accurate results were demonstrated in clinical studies performed at altitudes up to 1,609 meters (5,280 feet) and in studies simulating altitudes up to 3,048 meters (10,000 feet).

Healthcare professionals—please note these additional limitations of procedure:
- Fresh capillary blood may be collected into heparin-containing test tubes if the blood is used within 10 minutes. **Do Not** use other anticoagulants or preservatives.
- Interferences: Acetaminophen, salicylates, uric acid, ascorbic acid (Vitamin C), and other reducing substances (when occurring in normal blood or normal therapeutic concentrations) do not significantly affect results. However, abnormally high concentrations in blood may cause inaccurately high results.
- Patients undergoing oxygen therapy may yield falsely low results.
- Test results may be falsely low if the patient is severely dehydrated, in shock, or in a hyperosmolar state (with or without ketosis). Critically ill patients should not be tested by blood glucose meters.
- Lipemic samples: Cholesterol levels up to 18.1 mmol/L (700 mg/dL) and triglycerides up to 33.9 mmol/L (3,000 mg/dL) do not affect the results. Grossly lipemic patient samples have not been tested and are not recommended for testing with the OneTouch® Ultra® Family of Meters and InDuo™ Systems.

## Test Principle

The OneTouch® Ultra® Family of Meters and InDuo™ Systems are plasma-calibrated to allow easy comparison of results with laboratory methods. Glucose in the blood sample mixes with special chemicals on the test strip and a small electrical current is produced. This current is measured by the OneTouch® Ultra® Family of Meters and InDuo™ Systems and displayed as your blood glucose result. The strength of this current changes with the amount of glucose in the blood sample.

## Reagent Composition

Each test strip contains: Glucose oxidase (Aspergillus niger) ≥ 0.08 IU; ferricyanide ≥ 22 µg; other ingredients (buffer, etc.). The test strip vial contains a drying agent.

## Performance Characteristics

The performance of OneTouch® Ultra® Test Strips have been evaluated both in laboratory and in clinical tests.[2]

Measurement Range: The measurement range of the OneTouch® Ultra® System is 1.1 to 33.3 mmol/L (20–600 mg/dL).

Clinical Accuracy: The accuracy of the OneTouch® Ultra® System was assessed by comparing blood glucose results obtained by patients with those obtained using a YSI Model 2300 Glucose Analyzer, a laboratory instrument. The following results were obtained by 117 diabetic patients at 3 clinical centres:

| | |
|---|---|
| Slope | 0.986 |
| y-intercept | -0.3 mmol/L (-5.5 mg/dL) |
| Correlation coefficient (r) | 0.984 |
| No. of samples | 117 |
| Range tested | 2.0–24.1mmol/L (36.4–434 mg/dL) |

- Cuando abra el vial por primera vez, anote la fecha límite de uso en la etiqueta del mismo (fecha de apertura inicial más 6 meses).
- **No utilice** las tiras reactivas después de la fecha de caducidad (impresa en la etiqueta del vial) o de la fecha límite de uso, la que se cumpla primero.
- Evite que las tiras reactivas entren en contacto con suciedad, alimentos y líquidos. Con las manos limpias y secas puede tocar cualquier parte de la superficie de la tira reactiva.
- **No doble, corte ni altere** en modo alguno las tiras reactivas.
- Las tiras reactivas son para un solo uso. **No reutilice nunca una tira reactiva sobre la que se haya aplicado previamente sangre o solución de control.**
- Antes de comenzar el análisis, asegúrese de que el medidor y las tiras reactivas se encuentren más o menos a la misma temperatura.
- Aplique exclusivamente una muestra de solución de control o una muestra de sangre sobre la tira reactiva.
- Después de realizar un análisis, no vuelva a introducir la tira reactiva usada en el vial.
- En algunas regiones, las tiras reactivas usadas se consideran residuos biopeligrosos. Tome las precauciones necesarias para deshacerse de estos materiales, según la legislación local y las recomendaciones del profesional sanitario que le atiende.

⚠ **ADVERTENCIA:** mantenga el vial de tiras reactivas fuera del alcance de los niños. Las tiras reactivas podrían causar asfixia. No ingerir las tiras reactivas. El vial de tiras reactivas puede contener agentes desecantes que podrían ser nocivos por inhalación o ingestión, además de producir irritación en la piel o en los ojos. No ingerir ni tragar ninguno de los componentes.

## Procedimiento de análisis de glucosa en sangre

Para obtener instrucciones sobre cómo realizar un análisis de glucosa en sangre (incluyendo la obtención de muestras de sangre), consulte el manual del usuario suministrado junto con su sistema.

⚠ **PRECAUCIÓN:** para obtener resultados exactos, es fundamental que los códigos del medidor y del vial de tiras reactivas coincidan. Cada vez que realice un análisis, asegúrese de que los números de los códigos coinciden. Para obtener instrucciones sobre la correcta codificación del medidor, consulte el manual del usuario suministrado con su sistema.

## Resultados del análisis

**Valores de glucosa bajos**
Si el resultado del análisis es inferior a 20 mg/dL (1,1 mmol/L), aparece un mensaje de advertencia que indica un nivel de glucosa bajo. Esto podría indicar una hipoglucemia severa (contenido de glucosa en sangre muy bajo). En este caso, aplique de inmediato el tratamiento previsto siguiendo las recomendaciones de su profesional sanitario. Aunque este mensaje podría deberse a un error al realizar el análisis, es más seguro administrar el tratamiento en primer lugar y después repetir el análisis.

**Valores de glucosa altos**
Si el resultado del análisis es superior a 600 mg/dL (33,3 mmol/L), aparece un mensaje de advertencia que indica un nivel de glucosa alto. Esto puede indicar una hiperglucemia severa (contenido de glucosa en sangre muy alto). En este caso, vuelva a comprobar el nivel de glucosa. Si el mensaje de advertencia vuelve a aparecer, consulte inmediatamente a su profesional sanitario.

**Si obtiene resultados inesperados**
Si el resultado de glucosa en su sangre es inferior a 70 mg/dL (3,9 mmol/L), lo que indicaría un nivel de glucosa en sangre bajo, o bien es superior a 180 mg/dL (10,0 mmol/L), lo que indicaría un nivel de glucosa en sangre alto, debe consultar a su profesional sanitario y seguir sus indicaciones de tratamiento.[1] Si sigue obteniendo resultados inesperados, compruebe el sistema con la solución de control. Si padece síntomas que no se corresponden con los resultados del análisis de glucosa en sangre Y ADEMÁS ha seguido todas las instrucciones descritas en el manual de usuario, póngase en contacto con su profesional sanitario. Nunca ignore síntomas ni realice cambios significativos en su programa de control de la diabetes sin consultar al profesional sanitario que le atiende.

## Objetivo de glucemia

El control de la cantidad de glucosa en sangre requiere la ayuda de un profesional sanitario. Juntos pueden establecer el rango de valores de glucosa en sangre recomendable en su caso, decidir el momento de sus análisis y comentar el significado de sus resultados.

Niveles de glucosa en sangre esperados para personas sin diabetes:[1]

| Hora | Rango, mg/dL | Intervalo, mmol/L |
|---|---|---|
| En ayunas | Menos de 100 | Menos de 5,6 |
| 2 horas después de las comidas | Menos de 140 | Menos de 7,8 |

## Comprobación del sistema

**Utilice solución de control OneTouch® Ultra®**
Para comprobar si el medidor y las tiras reactivas funcionan correctamente en conjunto y asegurarse de que se está realizando el análisis correctamente, es necesario realizar un análisis con la solución de control. Para obtener más instrucciones sobre cómo y cuándo comprobar el sistema mediante un análisis con la solución de control, consulte el manual del usuario suministrado con su sistema.

## Limitaciones

Las tiras reactivas OneTouch® Ultra® proporcionan resultados exactos siempre que se tengan en cuenta las siguientes limitaciones:
- **No** deben utilizarse para el diagnóstico de la diabetes ni para analizar muestras de sangre de neonatos.
- Las tiras reactivas son para un solo uso. **Nunca** utilizar una misma tira para más de un análisis.
- Las tiras reactivas están diseñadas específicamente para la D-glucosa y no reaccionan con otros azúcares que puedan estar presentes en la sangre.
- Utilice únicamente sangre capilar recién extraída. **No** utilice suero ni plasma.

- El hematocrito es el porcentaje de glóbulos rojos en la sangre. Un nivel extremo de hematocrito puede afectar a los resultados del análisis.[†] Un nivel de hematocrito inferior al 30% puede producir valores altos falsos, mientras que un nivel de hematocrito superior al 55% puede producir valores bajos falsos. Si desconoce su nivel de hematocrito, consulte al profesional sanitario que le atiende.
- Las tiras reactivas OneTouch® Ultra® pueden utilizarse a altitudes de hasta 3.048 metros (10.000 pies) sin que ello altere los resultados del análisis. Se obtuvieron resultados exactos en estudios clínicos realizados a altitudes de hasta 1.609 metros (5.280 pies) y en estudios que simularon altitudes de hasta 3.048 metros (10.000 pies).

*Los profesionales sanitarios deberán tener en cuenta estos indicaciones de procedimiento adicionales:*

- Siempre se utilice antes de 10 minutos desde su extracción, la sangre capilar recién extraída se puede recoger en tubos de ensayo que contengan heparina. No utilice otros anticoagulantes ni conservantes.
- Interferencias: El acetaminofeno, los salicilatos, los ácidos úrico y ascórbico (vitamina C) y otras substancias reductoras (siempre que se produzcan en concentraciones normales en la sangre o en concentraciones terapéuticas normales) no alteran los resultados de manera significativa. Sin embargo, la presencia de concentraciones anormalmente elevadas en la sangre puede causar resultados altos incorrectos.
- En pacientes sometidos a terapia con oxígeno podrían producirse resultados bajos falsos.
- Si el paciente está excesivamente deshidratado, en estado de shock o en un estado hiperosmolar (con o sin cetosis), los resultados del análisis pueden indicar valores bajos falsos. No se deben analizar muestras de medidores de glucosa en sangre a pacientes gravemente enfermos.
- Muestras lipémicas: Los niveles de colesterol de hasta 700 mg/dL (18,1 mmol/L) y los niveles de triglicéridos de hasta 3.000 mg/dL (33,9 mmol/L) no alteran los resultados. No se han analizado muestras de pacientes excesivamente lipémicas, por lo que se recomienda no analizarlas con la familia de medidores OneTouch® Ultra®.

### Principios en los que se basa el análisis

La familia de medidores OneTouch® Ultra® están calibrados con plasma para facilitar la comparación de los resultados con los resultados obtenidos con métodos de laboratorio. La familia de medidores OneTouch® Ultra® miden esta corriente y la convierten en un resultado de glucosa en sangre. La intensidad de esta corriente varía en función de la cantidad de glucosa contenida en la muestra de sangre.

### Composición del reactivo

Cada tira reactiva contiene: glucosa oxidasa (*aspergillus niger*) ≥ 0,08 UI; ferricianuro ≥ 22 µg; otros ingredientes (solución tampón, etc.). La tira reactiva contiene un agente desecante.

### Características de comportamiento

El comportamiento de las tiras reactivas OneTouch® Ultra® ha sido evaluado tanto en ensayos de laboratorio como en ensayos clínicos.[†]

Intervalo de medición: el rango de medición del sistema OneTouch® Ultra® es de 20 a 600 mg/dL (1,1–33,3 mmol/L).

Exactitud: La exactitud del sistema OneTouch® Ultra® se evaluó comparando los resultados de glucosa en sangre obtenidos en pacientes con los obtenidos mediante el instrumento de laboratorio "YSI Model 2300 Glucose Analyzer". Se obtuvieron los siguientes resultados en 117 pacientes diabéticos de tres centros clínicos:

| | |
|---|---|
| Pendiente | 0,986 |
| Intersección con el eje de ordenadas | -5,5 mg/dL (-0,3 mmol/L) |
| Coeficiente de correlación (r) | 0,984 |
| N.º de muestras | 117 |
| Intervalo de análisis | 36,4–434 mg/dL (2,0–24,1mmol/L) |

Este estudio demuestra que el medidor OneTouch® Ultra® es comparable con el procedimiento de laboratorio. Se llevaron a cabo estudios clínicos adicionales utilizando la familia de medidores OneTouch® Ultra®.

Precisión:

| Precisión intraserie | Sangre$_{media}$ 45 mg/dL (2,5 mmol/L) | CV = 3,2% |
|---|---|---|
| | Sangre$_{media}$ 77 mg/dL (4,3 mmol/L) | CV = 2,0% |
| | Sangre$_{media}$ 129 mg/dL (7,2 mmol/L) | CV = 2,1% |
| | Sangre$_{media}$ 220 mg/dL (12,2 mmol/L) | CV = 1,8% |
| | Sangre$_{media}$ 364 mg/dL (20,3 mmol/L) | CV = 1,6% |
| Precisión total | Control 44 mg/dL (2,4 mmol/L) | CV = 4,4% |
| | Control 171 mg/dL (9,5 mmol/L) | CV = 2,6% |
| | Control 366 mg/dL (20,3 mmol/L) | CV = 2,4% |

Este estudio muestra una variabilidad de una tira a otra equivalente o inferior al 3,2% en los análisis de sangre.

**IMPORTANTE:** para obtener instrucciones de uso completas y otra información técnica importante, consulte el manual del usuario incluido con el sistema. SI TIENE CUALQUIER PREGUNTA SOBRE LA UTILIZACIÓN DE CUALQUIER PRODUCTO LIFESCAN, PÓNGASE EN CONTACTO CON EL 900 100 228.

### Referencias

1. Beaser, R.S. y Hill, Joan: The Joslin Guide to Diabetes. Nueva York: Simon & Schuster (1995), p. 158.
2. Datos en archivo.
3. Datos en archivo.
4. American Diabetes Association, Position Statement, Diagnosis and Classification of Diabetes Mellitus, Diabetes Care 31:S55-S60, 2008.

### Se obtiver resultados inesperados

Se o resultado de glicose no sangue for inferior a 70 mg/dL (3,9 mmol/L), indicando um nível baixo de glicose no sangue, ou superior a 180 mg/dL (10,0 mmol/L), indicando um nível alto de glicose no sangue, deverá contactar o profissional de saúde e seguir o conselho de tratamento prescrito.[†] Se continuar a obter resultados inesperados, verifique o sistema com a solução de controlo. Se apresentar sintomas que não estejam de acordo com os resultados dos testes de glicose no sangue e se tiver seguido todas as instruções descritas no Manual do Utilizador, contacte o seu profissional de saúde. Nunca ignore sintomas ou faça alterações significativas ao seu programa de tratamento sem conversar com o seu profissional de saúde.

### Intervalo de valores esperados

O controlo da glicose no sangue requer a ajuda de um profissional de saúde. Juntos podem estabelecer o seu próprio intervalo de valores previstos para a glicose no sangue, definir os melhores horários de teste e discutir o significado dos resultados obtidos.

Níveis previstos de glicose no sangue para pessoas sem diabetes:[4]

| Horário | Intervalo, mg/dL | Intervalo, mmol/L |
|---|---|---|
| Em jejum | Inferior a 100 | Inferior a 5,6 |
| 2 horas depois das refeições | Inferior a 140 | Inferior a 7,8 |

### Verificação do sistema

Utilize soluções de controlo OneTouch® Ultra®. É efectuado um teste com solução de controlo para verificar se o medidor e as tiras de teste funcionam adequadamente em conjunto e está a efectuar o teste correctamente. Para obter instruções sobre como e quando verificar o sistema, efectuando um teste com solução de controlo, consulte o Manual do Utilizador fornecido com o sistema.

### Limitações ao procedimento

As tiras de teste OneTouch® Ultra® fornecem resultados exactos quando as limitações seguintes são observadas:

- Não utilize para o diagnóstico de diabetes ou para testes em recém-nascidos.
- As tiras de teste destinam-se a uma única utilização. Não as reutilize.
- As tiras de teste são específicas para D-glicose e não reagem a outros açúcares, que podem estar presentes no sangue.
- Utilize apenas sangue capilar recém-colhido. Não utilize soro ou plasma.
- Hematócrito corresponde à percentagem de glóbulos vermelhos no sangue. Os valores extremos de hematócrito podem afectar os resultados do teste.[†] Níveis de hematócrito inferiores a 30% podem indicar resultados altos falsos e níveis de hematócrito superiores a 55% podem indicar resultados baixos falsos. Se não sabe o seu nível de hematócrito, consulte o seu profissional de saúde.
- As tiras de teste OneTouch® Ultra® podem ser utilizadas em altitudes de até 3.048 metros sem alterar os resultados do teste. Foram demonstrados resultados exactos em estudos clínicos realizados a altitudes de até 1.609 metros e em estudos simulando altitudes de até 3.048 metros.

*Profissionais de saúde — observar estas limitações adicionais ao procedimento:*

- O sangue capilar recém-colhido pode ser colhido em tubos de teste contendo heparina se o sangue for utilizado num intervalo de 10 minutos. Não utilize outros anticoagulantes ou conservantes.
- Interferências: Acetaminofen salicilatos, ácido úrico, ácido ascórbico (vitamina C) e outras substâncias redutoras (quando ocorrendo em concentrações normais ou terapêuticas) não afectam significativamente os resultados. Contudo, concentrações anormalmente altas no sangue podem provocar resultados altos imprecisos.
- Os pacientes sob tratamento com oxigénio poderão apresentar resultados incorrectamente baixos.
- Os resultados do teste podem ser falsamente baixos se o paciente estiver muito desidratado, em choque ou em estado hiperosmolar (com ou sem cetose). Pacientes em estado crítico não devem ser testados por medidores de glicose no sangue.
- Amostras lipémicas: Níveis de colesterol até 700 mg/dL (18,1 mmol/L) e triglicéridos até 3000 mg/dL (33,9 mmol/L) não afectam os resultados. Amostras de pacientes altamente lipémicos não foram testadas e os testes com a família de medidores OneTouch® Ultra® não são recomendados.

### Princípio do teste

A família de medidores OneTouch® Ultra®, são calibrados para plasma para permitir a fácil comparação com os resultados de métodos laboratoriais. A glicose na amostra de sangue é combinada com os químicos especiais da tira de teste e é produzida uma pequena corrente eléctrica. Esta corrente é medida pela família de medidores OneTouch® Ultra®, sendo apresentada como resultado de glicose no sangue. A potência desta corrente altera-se de acordo com a quantidade de glicose na amostra de sangue.

### Composição do reagente

Cada tira de teste contém: Glicose oxidase (*aspergillus niger*) ≥ 0,08 IU; ferricianeto ≥ 22 µg; outros ingredientes (tampão, etc.). O tubo de tiras de teste contém um agente secante.

### Características de desempenho

O desempenho das tiras de teste OneTouch® Ultra® foi avaliado em testes clínicos e laboratoriais.[†]

Intervalo de medição: O intervalo de medição do sistema OneTouch® Ultra® é de 20 a 600 mg/dL (1,1–33,3 mmol/L).

Exactidão clínica: A exactidão do sistema OneTouch® Ultra® foi avaliada através da comparação dos resultados de glicose no sangue obtidos pelos pacientes com os resultados obtidos utilizando um YSI Model 2300 Glucose Analyzer, que é um instrumento laboratorial. Os resultados seguintes foram obtidos por 117 pacientes diabéticos em 3 centros clínicos:

| | |
|---|---|
| Nível | 0,986 |
| Intercepção-Y | -5,5 mg/dL (-0,3 mmol/L) |

**NUESTRO COMPROMISO CON USTED:**
Nuestro objetivo es ofrecer productos de alta calidad para el cuidado de la salud y un servicio de atención personal eficaz. Si no está completamente satisfecho con este producto, póngase en contacto con nuestra Línea de Atención Personal de LifeScan en el 900 100 228.
Si no puede ponerse en contacto con nuestra Línea de Atención Personal, consulte al profesional sanitario que le atiende.

| IVD | **Para auto-monitorização.** |

**IMPORTANTE:** Leia estas informações e o Manual do Utilizador da família dos medidores OneTouch® Ultra® antes de utilizar as tiras de teste OneTouch® Ultra®. Não utilize as tiras de teste OneTouch® Ultra® se o tubo estiver aberto ou danificado de alguma forma, uma vez que poderá dar origem a mensagens de erro ou a valores incorrectos de glicose no sangue. Se o tubo de tiras de teste estiver aberto ou danificado ou se o material que contém instruções ou os resultados do medidor não forem claros, contacte imediatamente o Serviço de Apoio a Clientes para o número 800 201 203 (chamada gratuita) - Horário de funcionamento de 2ª a 6ª das 09:00 às 18:00.

## Indicação de utilização

As tiras de teste OneTouch® Ultra® são utilizadas com a família de medidores OneTouch® Ultra® para medir quantitativamente a glicose no sangue capilar recém-colhido. As tiras de teste OneTouch® Ultra® e os medidores associados destinam-se a ser utilizados por pessoas com diabetes em ambulatório e por profissionais de saúde em ambiente clínico. As tiras de teste OneTouch® Ultra® e os medidores associados destinam-se a ser utilizados em testes na ponta do dedo, na palma da mão e antebraço.

## Armazenamento e manuseamento

- Guarde o tubo de tiras de teste num local seco e fresco, a uma temperatura inferior a 30°C (86°F). Não guarde no frigorífico. Mantenha a embalagem afastada da luz directa do sol e do calor. A exposição a temperaturas e/ou humidade fora das condições de armazenamento indicadas pode originar valores incorrectos.
- Guarde as tiras de teste apenas no respectivo tubo original. Para evitar danos ou contaminação, não transfira as tiras de teste para qualquer outro recipiente.
- Não abra o tubo de tiras de teste até estar preparado para realizar o teste. Abra o tubo apenas para retirar as tiras.
- Depois de retirar uma tira de teste do tubo, feche imediatamente a tampa do tubo, com firmeza. Utilize cada tira de teste imediatamente após retirar do tubo.
- Não utilize tiras de teste de nenhum tubo que esteja danificado ou tenha ficado aberto e exposto ao ar.
- Registe a data de eliminação (data de abertura mais 6 meses) no rótulo quando abrir o tubo pela primeira vez.
- Não utilize as tiras de teste após a data de validade (impressa no rótulo do tubo) ou de eliminação (a data que ocorrer primeiro).
- Evite sujar ou derramar alimentos ou líquidos na tira de teste. Com as mãos limpas e secas, pode tocar em qualquer parte da superfície da tira de teste.
- Não dobre, corte ou altere de forma alguma a tira de teste.
- As tiras de teste destinam-se a uma única utilização. Nunca reutilize uma tira de teste à qual tenha sido aplicada uma gota de solução de controlo ou uma amostra de sangue.
- Certifique-se de que o medidor e as tiras de teste estão sob a mesma temperatura antes de efectuar o teste.
- Aplique apenas a solução de controlo ou uma amostra de sangue na tira de teste.
- Depois de realizar um teste, não volte a colocar a tira de teste usada no tubo.
- As tiras de teste usadas podem ser consideradas lixo de risco biológico na sua região. Certifique-se de que cumpre as recomendações do profissional de saúde ou as regulamentações locais para eliminação adequada.

⚠ **ADVERTÊNCIA:** Mantenha o tubo da tira de teste fora do alcance das crianças. As tiras de teste podem provocar asfixia. Não ingira tiras de teste. O tubo das tiras de teste pode conter agentes secantes danosos se inalados ou ingeridos, e podem provocar irritação nos olhos e na pele. Não ingira nem engula qualquer peças.

## Procedimento do teste da glicose no sangue

Para obter instruções sobre como efectuar uma análise ao sangue (incluindo a colheita de amostras de sangue), consulte o Manual do Utilizador fornecido com o sistema.

⚠ **ATENÇÃO:** A correspondência do código apresentado no visor do medidor com o código impresso no tubo de tiras de teste é essencial para a obtenção de resultados exactos. Sempre que testar, verifique se os números de código coincidem. Para obter instruções sobre a codificação do medidor, consulte o Manual do Utilizador, fornecido com o sistema.

## Resultados do teste

**Valores de glicose no sangue baixos**
Se o resultado do teste for inferior a 20 mg/dL (1,1 mmol/L), será apresentada uma mensagem de aviso, indicando um nível baixo de glicose no sangue. Isso pode indicar hipoglicemia grave (nível baixo de açúcar no sangue). O estado de hipoglicemia deverá ser tratado imediatamente, de acordo com as recomendações do profissional de saúde. Embora esta mensagem possa ter origem num erro de teste, será mais seguro proceder primeiro ao tratamento e, em seguida, realizar outro teste.

**Valores de glicose no sangue altos**
Se o resultado do teste for superior a 600 mg/dL (33,3 mmol/L), será apresentada uma mensagem de aviso, indicando um nível alto de glicose no sangue. Isso pode indicar hiperglicemia grave (nível alto de açúcar no sangue). Deve voltar a testar o seu nível de glicose no sangue. Se a mensagem for apresentada novamente, contacte o seu profissional de saúde imediatamente.

---

| Coeficiente de correlação (r) | 0,984 |
| Número de amostras | 117 |
| Intervalo testado | 36,4–434 mg/dL (2,0–24,1 mmol/L) |

Este estudo indica que o medidor OneTouch® Ultra® é comparável ao método laboratorial. Foram realizados estudos clínicos adicionais utilizando medidores da família OneTouch® Ultra®.[3]

**Precisão:**

| Precisão intrassérie | Sangue_{av} 45 mg/dL (2,5 mmol/L) | CV = 3,2% |
| | Sangue_{av} 77 mg/dL (4,3 mmol/L) | CV = 2,0% |
| | Sangue_{av} 129 mg/dL (7,2 mmol/L) | CV = 2,1% |
| | Sangue_{av} 220 mg/dL (12,2 mmol/L) | CV = 1,8% |
| | Sangue_{av} 364 mg/dL (20,2 mmol/L) | CV = 1,6% |
| Precisão total | Controlo 44 mg/dL (2,4 mmol/L) | CV = 4,4% |
| | Controlo 171 mg/dL (9,5 mmol/L) | CV = 2,6% |
| | Controlo 366 mg/dL (20,3 mmol/L) | CV = 2,4% |

Este estudo indica uma variação igual ou inferior a 3,2% entre as tiras de teste em análises ao sangue.

**IMPORTANTE:** Para obter as instruções completas de funcionamento e outras informações técnicas importantes, consulte o Manual do Utilizador, fornecido com o sistema. EM CASO DE DÚVIDA ACERCA DA UTILIZAÇÃO DE QUALQUER PRODUTO LIFESCAN, LIGUE PARA O NÚMERO DO SERVIÇO DE APOIO A CLIENTES 800 201 203 (chamada gratuita) - Horário de funcionamento: de 2ª a 6ª das 09:00 às 18:00.

## Referências

1. Beaser, R.S. and Hill, Joan: The Joslin Guide to Diabetes. New York: Simon and Schuster (1995), p. 158.
2. Dados em arquivo.
3. Dados em arquivo.
4. American Diabetes Association, Position Statement, Diagnosis and Classification of Diabetes Mellitus, Diabetes Care 31:S55-S60, 2008.

**O NOSSO COMPROMISSO PARA COM O UTILIZADOR:**
O nosso objectivo é oferecer ao utilizador produtos de cuidados de saúde de qualidade e uma assistência dedicada ao cliente. Se não estiver totalmente satisfeito com este produto, contacte com o Serviço de Apoio a Clientes através do número 800 201 203 (chamada gratuita) - Horário de funcionamento de 2ª a 6ª das 09:00 às 18:00.
Caso não seja possível entrar em contacto com o Serviço de Apoio a Clientes, contacte o seu profissional de saúde para obter instruções.

## Description of Symbols/Descripción de los Símbolos/Descrição dos Símbolos

For a complete description of all symbols used, refer to the Owner's Booklet that came with your system./Para obtener una descripción completa de todos los símbolos utilizados, consulte el manual del usuario incluido con el sistema./Para uma descrição completa de todos os símbolos utilizados, consulte o Manual do Utilizador que acompanha o seu sistema.


LifeScan Europe
Division of Cilag GmbH
International
6300 Zug
Switzerland

 CE 0344

| Symbol/Símbolos/Símbolos | |
|---|---|
|  IVD | In Vitro Diagnostic Medical Device/Dispositivo médico para diagnóstico in vitro/Dispositivo médico para Diagnóstico in Vitro |
|  LOT | Lot No./Lote N.º/Número do lote |
|  | Exp. Date/Fecha de caducidad/Data de validade |
|  | Do not Reuse/Para un solo uso/Não reutilizar |
|  | Temperature limitation for storage/Límites de temperatura de almacenamiento/Limites de temperatura de armazenamento |
|  | Consult Instructions for use/Consulte las instrucciones de uso/Consultar as instruções de utilização |
|  | Contains sufficient for ⟨n⟩ tests/Contiene cantidad suficiente para ⟨n⟩ análisis/Contém quantidade suficiente para ⟨n⟩ testes |

Distribuído por:
LifeScan, Johnson & Johnson Lda.
Estrada Consiglieri Pedroso, 69A
Queluz de Baixo
2730-055 Barcarena
Portugal

Distributed by:
LifeScan UK/Ireland,
A div. of Ortho-Clinical Diagnostics, Johnson & Johnson,
50 - 100 Holmers Farm Way,
High Wycombe, Bucks HP12 4DP
United Kingdom

Distribuido por:
LifeScan, Johnson & Johnson, S.A
Paseo de las Doce Estrellas, 5-7
Campo de las Naciones 28042 Madrid, España



AW 06037969A
Patented/Patentado/Patenteado.
©2008 LifeScan.
Revision Date/Fecha de revisión/Data de revisão: 11/2010


LIFESCAN
a Johnson & Johnson company





ONE TOUCH

**Ultra** Test Strips
Blue

As your partner in diabetes care,
we welcome you to contact us.
1 800 227 8862 (English)
1 800 381 7226 (Español)
www.OneTouchDiabetes.com
www.OneTouchEnEspanol.com

Store below 86°F (30°C).
Do Not refrigerate. For single use only.
Consult Instructions for Use.

Do Not use if expiration date has passed.
Use within 6 months of opening test strip vial.

Each test strip contains: Glucose oxidase
(Aspergillus niger) ≥0.08 IU; ferricyanide
≥22 µg; other ingredients (buffer, etc.).
The test strip vial contains a drying agent.









